AC 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

SEP 2 0 2019

United States of America
v.

KAMAL BIJANPOUR

Defendant.

Case No. 19MJ03956

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 18, 2019, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 5861(d) | Possession of an Unregistered Firearm Suppressor |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/*
*Complainant's signature*

Douglas W. Choi, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___9/20/19___

*Judge's signature*

City and state:  Los Angeles, California

Hon. Patrick J. Walsh, Chief U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Douglas W. Choi, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a complaint against Kamal BIJANPOUR ("BIJANPOUR") for a violation of Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearms Suppressor).

2.   This affidavit is also made in support of an application for a warrant to search four FedEx parcels, and three United States Postal Service ("USPS") parcels (the "SUBJECT PARCELS") seized on September 18, 2019, and currently in the custody of Homeland Security Investigations ("HSI") in Los Angeles, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(a)(1)(A) (Dealing in Firearms Without a License), 922(l) (Illegal Importation of a Firearm), 922(o)(Illegal Possession of a Machinegun), 545(a) (Importation of Unregistered Firearms), 541 (Entry of goods falsely classified); and Title 26, United States Code, Section 5861(d) (Receipt or Possession of Unregistered Firearm) and 5844 (Unlawful Importation of a Firearm) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I have been employed as a Special Agent ("SA") with HSI since May of 2018.  I am a graduate of the Federal Law Enforcement Training Center ("FLETC") located in Glynco, Georgia and Artesia, New Mexico.  At FLETC, I was trained in investigative techniques, interviewing techniques, court procedures and federal administrative and criminal laws.  Prior to being a Special Agent with HSI, I was a Border Patrol Agent with Customs and Border Protection ("CBP") from August 2011 to May 2018.

6.     As an HSI SA assigned to the Los Angeles International Airport ("LAX"), Border Enforcement Security Task Force, I have worked at the International Mail Facility ("IMF").  I work with my counterparts at CBP, to identify and intercept inbound parcels and packages from various international sources that contain contents that are contrary to U.S. laws or items that

are prohibited in the United States, including firearms and firearms parts.

7.   As an HSI SA, I work closely with a Glock Switch Task Force consisting of multiple federal, state and local agencies specifically investigating the illegal proliferation of Glock switches.  These agencies include HSI, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Los Angeles Police Department and the California Department of Justice.  The members of this task force are subject matter experts of their respective agencies pertaining to Glock switches, firearms, and firearm parts like suppressors.  From working with this task force, I have gathered experience and knowledge in the identification, nomenclature and functionality of Glock switches and firearms suppressors.  I have also participated in multiple federal and state search warrants related to Glock switches and other firearms-related violations.

### III.  **SUMMARY OF PROBABLE CAUSE**

8.   On September 18, 2019, during the execution of federal search warrants, law enforcement found 13 suspected firearms suppressors, as well as 18 firearms at BIJANPOUR's residences and vehicle.  In a Mirandized post-arrest statement, BIJANPOUR referred to the 13 suspected firearms suppressors as "suppressors."  ATF records show that BIJANPOUR is not a licensed importer of firearms, including firearms suppressors, and that the suppressors seized were not registered.  An ATF expert has confirmed that these 13 suspected firearms suppressors are presumptively suppressors.

9.   Also during the execution of the search warrant, a FedEx delivery person and USPS letter carrier dropped off the seven SUBJECT PARCELS.  The SUBJECT PARCELS were from China, Virginia, and Pennsylvania.  Four of the parcels were purchases off of Wish.com, an online marketplace.  In a Mirandized post-arrest statement, BIJANPOUR stated that he ordered gun parts, including firearm suppressors from Wish.com.  The package from China was seized because BIJANPOUR has previously received approximately 768 parcels from China, a known exporter of firearms suppressors and Glock switches in 2018 and 2019 at his two residences, including an intercepted firearms suppressor in August 2019.

### IV. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Background in Firearms Suppressors and Glock Switches

#### 1.   Firearms Suppressors

11.   Firearm suppressors are described in Title 18, United States Code, Section 921(a)(24) as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned and intended for use in assembling or fabricating a firearm silencer or firearm muffler, or any part intended only for use in such assembly or fabrication."  Other common terms used for firearm suppressors are "firearm silencer," "firearm muffler," or

"silencer". Suppressors are a controlled item and are subject to control under the National Firearms Act.

12. According to the ATF, there has been an influx of counterfeit or non-regulated suppressors entering United States commerce via foreign sources. ATF has encountered these suppressors and partnered with CBP and HSI to combat the flow of these suppressors into the United States.

13. CBP officers report that they have intercepted suppressors or parts of suppressors, such as metal cylinders functioning as the outer shell of a suppressor, being shipped into the United States from various senders based out of China. However, because the metal cylinders do not contain a baffle, CBP will flag the package as suspicious, but then send the packages to their intended destinations.

14. The intercepted packages are mislabeled and incorrectly manifested. Senders identify the contents of the packages as "filters," "machine filter nozzle," "motorcycle filter," and other items with the word "filter" attached to the commodity description.

    2. <u>Glock Switches</u>

15. Glock switches – also known as "auto sears," "convertors," "conversion switches," "selector switches," "conversion devices," "Fire Selector Systems for Glock," or "FSSGs" – are devices that have been designed and created for the sole purpose of converting semi-automatic Glock-style handguns into fully automatic machineguns.

16.   A "Glock switch" can be installed quickly and easily on a Glock semi-automatic pistol by removing the cover plate of the firearm's polymer slide and replacing it with a "Glock switch".   This installation process requires no technical expertise.   Although Glock switches vary design and appearance, when properly installed on a semi-automatic Glock-style handgun, all Glock switches allow the firearm to expel multiple projectiles by a single pull of the trigger at approximately 1,200 rounds a minute.

17.   Because Glock switches are parts designed and intended solely and exclusively for use in converting a firearm into a machinegun, the ATF considers Glock switches to be machineguns within the meaning of Title 26, United States Code, Section 5845(b).[1]   In addition, Title 18, United States Code, Section 922(o) prohibits the transfer or possession of a machinegun manufactured after May 19, 1986.   ATF, the federal agency tasked

---

[1] 18 U.S.C. § 921(a)(23) states: "The term 'machinegun' has the meaning given to such term in . . . 26 U.S.C. § 5845(b)." 26 U.S.C. § 5845(b) in turn defines a "machinegun" as:

Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b)  (emphasis added).

with enforcing firearm regulations, is not aware of any Glock switches that were developed before May 19, 1986.

18. However, these switches are often advertised for illegal sale and are sold illegally on the Internet, often from China and other international senders. Further, although Glock switches have a Glock logo on them, Glock does not in fact manufacture Glock switches. Instead, Glock manufactures only one firearm model that is capable of fully automatic firing. The selector switch which enables fully automatic fire is built into the pistol slide and is not removable. Genuine fully automatic Glock firearms are highly restricted items that are sold only to law enforcement agencies and branches of the United States military.

**B.   Background on Investigation into BIJANPOUR**

19. On September 17, 2019, the Honorable Patrick J. Walsh, Chief United States Magistrate Judge authorized a search of the person of BIJANPOUR and BIJANPOUR's two residences and cars for evidence, fruits, and instrumentalities of the Subject Offenses (the "Search Warrants"). The affidavit underlying the application in support of the search warrants ("Affidavit") is attached hereto as Exhibit 1 and incorporated herein by reference.

20. As stated in greater detail in the Affidavit, in 2018 and 2019, BIJANPOUR received approximately 768 parcels from China, a known exporter of firearms suppressors and Glock switches. In August 2019, Customs and Border Protection officers intercepted a parcel containing a likely firearms

suppressor, as determined by an ATF expert, addressed to BIJANPOUR.

### C.   Firearms Suppressors Found in BIJANPOUR's Residence

21.   On September 18, 2019, HSI executed the search warrants.  At BIJANPOUR's residence at 1209 S. Spaulding Avenue, Los Angeles, California 90019, law enforcement found BIJANPOUR and 12 suspected firearms suppressors and 17 firearms[2] including an AK-47 type assault weapon, two Mossberg 500 shotguns, two Remington 870 shotguns, and a PTR-90 assault weapon, some of which were loaded.  Methamphetamine, which tested positive on a field testing kit, was also found on top of BIJANPOUR's computer desk, next to a handgun and rifle.

22.   I believe that the 12 suspected firearms suppressors are in fact firearm suppressors based on Senior Special Agent ("SSA") David Hamilton's examination and identification of the 12 suspected suppressors.  SSA Hamilton was present at the execution of the search warrant, examined the suspected suppressors, and opined that the 12 suspected firearm suppressors were presumptively classified as firearm suppressors, based on his training and experience.  SSA Hamilton's specialized training and experience relating to firearm suppressors are stated in greater detail in the Affidavit.

---

[2] All seized firearms were registered to BIJANPOUR and lawfully owned by him. The firearms at the 1209 South Spaulding Avenue were seized because of the presence of methamphetamine on the premises.

23.   At BIJANPOUR's second residence at 900 West Temple Street, Apartment 744b, Los Angeles, CA 90012, law enforcement found one additional suspected suppressor and several firearms, including a Barrett M82 .481 caliber sniper rifle, a Vector short barreled rifle, and a SOCOM MK16 rifle.   The suppressor was also examined and identified by SSA Hamilton as another presumptive suppressor.

24.   In BIJANPOUR's Mercedes Maybach, law enforcement found a loaded Smith and Wesson revolver.   In Mirandized post-arrest statements, BIJANPOUR stated that the 2018 Lexus sedan was registered to him, but that he uses the vehicle as a "company car," with the vehicle currently being used by his employee.

**D.    SUBJECT PARCELS from China, Wish.com, Pennsylvania, and Virginia Arrive During Execution of the Search Warrants**

25.   During the execution of the search warrant at BIJANPOUR's residence at 1209 South Spaulding Avenue, Los Angeles, California, 90019, agents saw a FedEx delivery person and USPS letter carrier leave the seven SUBJECT PARCELS in front of the residence.

26.   The SUBJECT PARCELS were seized because four of the parcels were from Wish.com, and, in Mirandized post-arrest statements, BIJANPOUR stated all purchases of firearm parts including the presumptive suppressors were from Wish.com. Another package was from China, which was seized because of BIJANPOUR's import history including being the intended recipient of a firearm suppressor as detailed more fully in the Affidavit.   The package from Virginia was seized because the

package size closely matched the size for firearm suppressor packaging.  Finally the package from Pennsylvania was seized because of its poor packaging, which indicates to me the presence of contraband, based on my training and experience; BIJANPOUR's history of receiving parcels at that residence; and because it was delivered around the same time as the other SUBJECT PARCELS.

### E.   BIJANPOUR's Statements

27.   On September 18, 2019, HSI SAs advised BIJANPOUR of his Miranda rights.  BIJANPOUR agreed to waive his Miranda rights and be interviewed by law enforcement.  Based on my interview of BIJANPOUR, I know that BIJANPOUR said the following, in substance and in part:

a.   BIJANPOUR stated that he purchases accessories for his firearms including flashlights, red dot sights, and firearm suppressors, which were called a "motorcycle sound suppressor" on Wish.com.  He stated that he purchases the firearms parts from Wish.com because they are cheaper than buying the accessories from a gun store.  He further stated that he did not own a motorcycle, and that he saw on YouTube, that a "motorcycle sound suppressor" would work as a silencer or muzzle brake on his firearms.  He stated that he purchased a "couple" of these "motorcycle sound suppressors" from different vendors on Wish.com.  He also stated that the "motorcycle sound suppressor" that he received did not fit any of his firearms, and were therefore useless.

b.   BIJANPOUR denied knowing that purchasing and owning an unregistered suppressor was illegal, indicating that if he was able to purchase it online it "must be legal."[3] He further stated that if it was in fact illegal to purchase the firearm suppressor online, that law enforcement should be pursuing the sellers in China, and not him. He also denied knowing anything about Glock switches.

c.   BIJANPOUR attempted to explain the large volume of packages that he received at his residences, and indicated that he shops for most items online.  No statement was made regarding the SUBJECT PARCELS, specifically.

## V.   NON-ATTACHMENT OF AFFIDAVIT

28.   The affidavit has not been attached to the search warrant because allowing disclosure to BIJANPOUR during the search would give BIJANPOUR and other subjects of the investigation (such as the senders of the SUBJECT PARCELS) an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee from prosecution, or otherwise seriously jeopardize the investigation.  In addition, I am aware that "if the face sheet and attachments clearly state that the agents have lawful authority to conduct the search and specify the location to be searched and the items sought, the affidavit

---

[3] Based on my training and experience and on my conversation with the United States Attorney's Office, I understand that awareness of illegality is not an element of Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearms Suppressor).  The government need not prove that the defendant knew that possessing the firearm was illegal.  United States v. Summers, 268 F.3d 683, 688 (9th Cir. 2001); Ninth Circuit Model Criminal Jury Instruction No. 9.34 (2010 ed.; Sept. 2014 rev.)

supporting the probable cause determination need not be served at the time of the search." <u>United States v. Celestine</u>, 324 F.3d 1095, 1100, 1101 (9th Cir. 2003).

## VI. CONCLUSION

29.  For all of the reasons described above, there is probable cause to believe that BIJANPOUR has violated Title 26, United States Code, Section 5861(d) (Possession of an Unregistered Firearms Suppressor) and that there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PARCELS described in Attachment A.


Douglas W. Choi, Special Agent
Homeland Security
Investigations


Subscribed to and sworn before me
this 20 day of September, 2019.


UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PARCELS TO BE SEARCHED

The parcels to be searched are the following:

Parcel 1: Listed sender "Valentine Ibe, 228 N. Sandy Lane, Sinking Spring, PA 19608," addressed to "Kamal BIJANPOUR at 1209 South Spaulding Avenue, Los Angeles, CA 90019."

Parcel 2: Listed Sender "Teresa Matney, 23394 Briel Rd., Abington, VA 24211," addressed to "Kamal BIJANPOUR at 1209 South Spaulding Avenue, Los Angeles, CA 90019."

Parcel 3: Listed Sender "Cheng Jing, Hongtiang Jinshanlu 228 2# 5lou jiangbei Ningbo Zhejiang 315000 China," addressed to "Kamal BIJANPOUR at 1209 South Spaulding Avenue, Los Angeles, CA 90019."

Parcels 4-7: Listed Sender "Wish.com, 3950 Ponderosa Way, Las Vegas, NV 89118," addressed to "Kamal BIJANPOUR at 1209 South Spaulding Avenue, Los Angeles, CA 90019."

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(a)(1)(A) (Dealing in Firearms Without a License), 922(l) (Illegal Importation of a Firearm), 922(o) (Illegal Possession of a Machinegun), 541 (Entry of Goods Falsely Classified), 545(a) (Importation of Unregistered Firearms); Title 26, United States Code, Section 5861(d) (Receipt or Possession of Unregistered Firearm) and 5844 (Unlawful Importation of a Firearm) (the "Subject Offenses"), namely:

a. Firearms and firearms-related items, including firearms suppressors, firearms accessories, firearms attachments, machineguns, Glock switches, silencers, ammunition, body armor, or other dangerous weapons;

b. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of firearms, firearms suppressors, firearms accessories, firearms attachments or firearms customers, including invoices, distribution or customer lists, correspondence, receipts, shipping lists, manifests, commodity descriptions, customs forms, records, and documents noting price, quantities, and/or times when firearms, firearms suppressors, firearms accessories, firearms attachments or ammunition were bought, sold, or otherwise distributed;

i

c.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and records, documents, or information pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records and cryptocurrency records.

# EXHIBIT 1: AFFIDAVIT

## AFFIDAVIT

I, Douglas W. Choi, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a warrant to search the following:

a.   1209 South Spaulding Avenue, Los Angeles, California 90019 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1;

b.   900 W. Temple Street, Apartment 744b, Los Angeles, California 90012 ("SUBJECT PREMISES 2"), as described more fully in attachment A-2;

c.   a 2015 Mercedes Maybach bearing California license plate 8JJZ434 ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-3; and

d.   a 2018 Lexus sedan bearing California license plate 8JJZ434 ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-4.

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(a)(1)(A) (Dealing in Firearms Without a License), 922(l) (Illegal Importation of a Firearm), 922(o)(Illegal Possession of a Machinegun), 545(a) (Importation of Unregistered Firearms), 541 (Entry of goods falsely classified); and Title 26, United States Code, Section 5861(d) (Receipt or Possession of Unregistered Firearm) and 5844 (Unlawful Importation of a Firearm) (the "Subject Offenses"), as

described more fully in Attachment B.   Attachments A-1 through
A-4, and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am a Special Agent ("SA") with Homeland Security
Investigations ("HSI"), United States Department of Homeland
Security, and have been employed as a Special Agent with HSI
since May of 2018.  I am a graduate of the Federal Law
Enforcement Training Center ("FLETC") located in Glynco, Georgia
and Artesia, New Mexico.  At FLETC, I was trained in
investigative techniques, interviewing techniques, court
procedures and federal administrative and criminal laws.  Prior
to being a Special Agent with HSI, I was a Border Patrol Agent
with Customs and Border Protection ("CBP") from August 2011 to
May 2018.

5.   As an HSI SA assigned to the Los Angeles International
Airport ("LAX"), Border Enforcement Security Task Force, I have
worked at the International Mail Facility ("IMF").  I work with
my counterparts at CBP, to identify and intercept inbound

parcels and packages from various international sources that
contain contents that are contrary to U.S. laws or items that
are prohibited in the United States, including firearms and
firearms parts.

6.    As an HSI SA, I work closely with a Glock Switch Task
Force consisting of multiple federal, state and local agencies
specifically investigating the illegal proliferation of Glock
switches.  These agencies include HSI, Bureau of Alcohol,
Tobacco, Firearms and Explosives ("ATF"), the Los Angeles Police
Department and the California Department of Justice.  The
members of this task force are subject matter experts of their
respective agencies pertaining to Glock switches, firearms, and
firearm parts like suppressors.  From working with this task
force, I have gathered experience and knowledge in the
identification, nomenclature and functionality of Glock switches
and firearms suppressors.  I have also participated in multiple
federal and state search warrants related to Glock switches and
other firearms-related violations.

III.  SUMMARY OF PROBABLE CAUSE

7.    On or about August 14, 2019, pursuant to its border
search authority, CBP officers intercepted and searched a
package at the IMF in Torrance, California addressed to Kamal
BIJANPOUR ("BIJANPOUR") at SUBJECT PREMISES 1.  The parcel
contained a firearms suppressor, as identified by the ATF.

8.    Further checks into BIJANPOUR's import and export
history by CBP officers revealed that, since the beginning of
the year 2018, he has received nearly 900 parcels, of which 768

3

were from China, a known exporter of firearms suppressors and Glock switches.[1]  All of those 768 parcels were destined for SUBJECT PREMISES 1 and SUBJECT PREMISES 2.  Amongst these parcels, BIJANPOUR has received parcels that have been identified as suppressors or parts of suppressors by CBP. Furthermore, BIJANPOUR has received parcels from multiple senders and shipping addresses known to ship Glock switches into the United States.

9.  BIJANPOUR purchased SUBJECT PREMISES 1 and rents SUBJECT PREMISES 2.  Recent surveillance shows that BIJANPOUR frequents both SUBJECT PREMISES 1 and SUBJECT PREMISES 2, and that he drives both SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2, which are both registered to him.

## IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.  Background on Inspection of Parcels at the Border

11.  CBP must first examine and admit international mail parcels and shipments that arrive in the United States before they are delivered to their destinations by a carrier, including the United States Postal Service ("USPS").  CBP officers are assigned to IMFs, like the IMF located at Torrance, California.

---

[1] As discussed below, a Glock switch converts a semi-automatic Glock pistol into a fully automatic firearm and thus qualifies as a "machinegun" under 26 U.S.C. § 5845(b) because it is a combination of parts designed and intended solely and exclusively for use in converting a firearm into a fully automatic gun.

CBP officers conduct routine examinations of foreign mail service parcels at the LAX IMF as the parcels enter the United States before the parcels are prepared for delivery to their destination.

12. These examinations are conducted pursuant to CBP's authority under Title 19, Code of Federal Regulations, Section 162.6, which provides that CBP officers and certain other law enforcement officers may generally conduct examinations of goods entering the United States at a border without a search warrant, probable cause, or individualized suspicion.[2]

13. According to CBP officers at the IMF at Torrance, California, due to the large volume of cargo that enters the United States daily, CBP is unable to examine all parcels. As a reference, for September 11, 2019, the IMF at Torrance, California anticipated approximately 190,000 to 248,000 incoming parcels arriving in the United States and traversing through the IMF.

14. For that reason, CBP uses a variety of methods to select parcels for border search examination, including both random and targeted inspections. CBP officers finding prohibited items will take note of specific information about the package such as the sender, addressees, consignees, commodity descriptions, and weight. Based on this information, CBP officers will begin targeting specific packages that match

---

[2] From my conversations with the United States Attorney's Office, I am also aware of the following case law holding that searches at the border do not require probable cause or a warrant. United States v. Ramsey, 431 U.S. 606, 619 (1977).

this flagged information.  Any seizure of prohibited items are annotated.  CBP then compiles local and national targeting lists based on the data derived from the noted information, annotations and seizures.

**B.   Background on Firearm Suppressors and Identification of HONGMEI SONG and "LAISIYIWS" As Senders of Suppressors or Suppressor Parts**

15.   Firearm suppressors are described in Title 18, United States Code, Section 921(a)(24) as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned and intended for use in assembling or fabricating a firearm silencer or firearm muffler, or any part intended only for use in such assembly or fabrication."

16.   Other common terms used for firearm suppressors are "firearm silencer," "firearm muffler," or "silencer".  Suppressors are a controlled item and are subject to control under the National Firearms Act.

17.   According to the ATF, there has been an influx of counterfeit or non-regulated suppressors entering United States commerce via foreign sources. ATF has encountered these suppressors and partnered with CBP and HSI to combat the flow of these suppressors into the United States.

18.   CBP officers report that they have intercepted suppressors or parts of suppressors, such as metal cylinders functioning as the outer shell of a suppressor, being shipped into the United States from various senders based out of China. However, because the metal cylinders do not contain a baffle,

6

CBP will flag the package as suspicious, but then send the packages to their intended destinations.

19. The intercepted packages are mislabeled and incorrectly manifested. Senders identify the contents of the packages as "filters," "machine filter nozzle," "motorcycle filter," and other items with the word "filter" attached to the commodity description.

20. CBP officers have flagged the sender "LAISIYIWS" as a sender of firearms, firearms parts, suppressors and suppressor parts. This identification is based on the fact that packages intercepted by CBP with the sender "LAISIYIWS" often contain metal cylinders believed to be the outer shell of a suppressor and Glock switches. The suppressor parts were mislabeled as "machine filter nozzles." For this reason, packages from the sender "LAISIYIWS" are actively targeted for inspection by CBP officers at the IMF in Torrance, California.

21. CBP officers have also flagged the sender HONGMEI SONG as a sender of suppressors or suppressor parts. This identification is based upon seizures of suppressors throughout the United States from parcels with HONGMEI SONG as the sender, similar commodity descriptions including the term "filter," and similar package weights. For these reasons, packages from HONGMEI SONG are actively targeted for inspection by CBP officers at the IMF in Torrance, California.

    C.    **CBP Intercepts a Firearm Suppressor from HONGMEI SONG to BIJANPOUR, Destined for SUBJECT PREMISES 1**

22. On August 14, 2019, a CBP officer assigned to the IMF at Torrance, California intercepted one parcel from sender HONGMEI SONG. The intended recipient was BIJANPOUR. The parcel was described as containing a "filter" and was addressed to SUBJECT PREMISES 1.

23. Based on their training and experience investigating HONGMEI SONG as a sender of suppressors and suppressor parts, CBP officers believed the parcel potentially contained suppressors or firearm-related items. Upon inspection of the parcel, CBP officers discovered what they believed in their training and experience to be a firearms suppressor. CBP officers notified HSI LAX and took photos of the parcel and its contents. CBP officers also placed a hold on all incoming parcels to BIJANPOUR from sender HONGMEI SONG. CBP identified four other parcels classified as "filters" from sender HONGMEI SONG to BIJANPOUR with SUBJECT PREMISES 1 as the intended destination.

    D.    **HSI and ATF Response to CBP's Request at the IMF in Torrance, California**

24. On August 17, 2019 I met with CBP officers at the IMF in Torrance, California regarding the discovery of a suppressor addressed to BIJANPOUR at SUBJECT PREMISES 1. I physically inspected the parcel, which identified the sender as HONGMEI SONG, listed the intended addressee as BIJANPOUR, and the intended address as SUBJECT PREMISES 1, and described the contents of the package as a "filter" in the English language.

25.   Afterwards, I physically inspected the contents of the parcel which revealed a black and white photo, a metal cylinder tube and a plastic tube.  The black and white photo was labeled "Motorcycles fuel filter installation."  Upon inspection of the photo, I observed the metal cylinder tube connected to the plastic tube.  However, upon closer inspection, in the photo the metal cylinder tube was not connected to any part of the engine or the motorcycle.  I then inspected the plastic tube.  The tube was red in color and had numerical digits written on its side. The tube was similar in structure, length and width as that of a large drinking straw.  I then inspected the metal cylinder tube. The tip of the cylinder tube was screwed on.  When the screw was removed, the interior of the metal cylinder tube revealed a metal baffle.  The metal baffle had circular openings on either side.  I believed, based on my training and experience, that the metal cylinder tube with a metal baffle was in fact a firearm suppressor.

26.   On August 20, 2019, I contacted ATF Senior Special Agent ("SSA") David Hamilton regarding the parcel.  SSA Hamilton has been employed as an ATF Special Agent for 19 years, is an ATF Firearms and Ammunition Interstate Nexus Expert, and has testified as a firearms expert in Federal Court more than 50 times.  SSA Hamilton reviewed the photographs of the parcel addressed to BIJANPOUR at SUBJECT PREMISES 1 and opined that the components and device design are consistent with other devices that ATF has classified as silencers.  Although a definitive classification would have to be made by a qualified laboratory,

9

such as the ATF's Firearms and Technology Division, there is

probable cause to believe that the recovered device is a

"firearm silencer" and a "firearm" as defined under Title 18,

United States Code sections 921(a)(24), 921(a)(3) and Title 26,

United States Code section 5485(a).  SSA Hamilton also noted

that the lack of a serial number or other manufacturer markings

precludes registration of this firearm in the National Firearms

Registration and Transfer Record.

27.  On or about August 22, 2019, ATF confirmed that

BIJANPOUR does not have a license to import firearms.

E.   Background on Glock Switches and Identification of
     "TAOZHENGMING," "WANGLIANHUI," "FOURUNCLES00142,"
     "LAISIYI," and "LAISIYIWS," as Senders of Glock
     Switches by CBP

28.  Glock switches — also known as "auto sears,"

"convertors," "conversion switches," "selector switches,"

"conversion devices," "Fire Selector Systems for Glock," or

"FSSGs" — are devices that have been designed and created for

the sole purpose of converting semi-automatic Glock-style

handguns into fully automatic machineguns.

29.  Although Glock switches vary design and appearance,

when properly installed on a semi-automatic Glock-style handgun,

all Glock switches allow the firearm to expel multiple

projectiles by a single pull of the trigger at approximately

1,200 rounds a minute.

30.  A "Glock switch" can be installed quickly and easily

on a Glock semi-automatic pistol by removing the cover plate of

the firearm's polymer slide and replacing it with a "Glock

switch". This installation process requires no technical expertise.

31. Because Glock switches are parts designed and intended solely and exclusively for use in converting a firearm into a machinegun, the ATF considers Glock switches to be machineguns within the meaning of Title 26, United States Code section 5845(b).[3]

32. Title 18, United States Code, section 922(o) prohibits the transfer or possession of a machinegun manufactured after May 19, 1986. ATF, the federal agency tasked with enforcing firearm regulations, is not aware of any Glock switches that were developed before May 19, 1986.

33. However, these switches are often advertised for illegal sale and are sold illegally on the Internet, often from China and other international senders. Most of the Glock switches that HSI and CBP has intercepted were shipped from China.

---

[3] 18 U.S.C. § 921(a)(23) states: "The term 'machinegun' has the meaning given to such term in . . . 26 U.S.C. § 5845(b)." 26 U.S.C. § 5845(b) in turn defines a "machinegun" as:

Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).

34. Further, although Glock switches have a Glock logo on them, Glock does not in fact manufacture Glock switches. Instead, Glock manufactures only one firearm model that is capable of fully automatic firing. The selector switch which enables fully automatic fire is built into the pistol slide and is not removable. Genuine fully automatic Glock firearms are highly restricted items that are sold only to law enforcement agencies and branches of the United States military.

35. In 2018, the ATF began investigating the illegal importation of Glock switches into the United States from China. In January of 2019, four Glock switches were intercepted and sent to the ATF for inspection and testing. Testing determined that the four Glock switches were functional. ATF agents examined the parcel and determined that the parcel was shipped by "TAOZHENGMING" with an address of "Room b312, 3th floor of 34 building, dahe industrial area, huanguan south road, guanlan street Shenzhen, Guangdong, 518131 China.

36. Subsequently, at ATF's request, CBP began actively targeting packages from "TAOZHENGMING", and on February 12, 2019, at the IMF at Torrance, California, CBP officers identified two international mail parcels from China as potentially containing Glock switches because the listed sender was "TAOZHENGMING" with the same address as the packages intercepted in January. The parcels were opened, and a total of 20 Glock switches were discovered.

37. In addition to "TAOZHENGMING", CBP has further identified "WANGLIANHUI," "FOURUNCLES00142," "LAISIYI," and

"LAISIYIWS," as senders who have either attempted to or have successfully shipped Glock switches into the United States. Since February 1, 2019, according to internal reports and records, CBP officers at the IMF in Torrance, California have intercepted 75 parcels from "TAOZHENGMING," 22 parcels from "WANGLIANHUI," 14 parcels from "FOURUNCLES00142," one parcel from "LAISIYI," and one parcel from "LAISIYIWS," that contained Glock switches.[4]

    F.   BIJANPOUR'S Import History and Ties to Prior Glock
         Switch Parcels

    38.  On August 20, 2019, I met with CBP officers at the IMF in Torrance, California to discuss BIJANPOUR's historical import history.  Analysis by CBP officers showed that BIJANPOUR had received a package from WANGLIANHUI as early as December 2018. The description of the parcel and the weight of the parcel closely matched other intercepted parcels from WANGLIANHUI that were determined to be Glock switches.

    39.  On September 11, 2019, I further reviewed BIJANPOUR's import history and found that BIJANPOUR had received packages from "TAOZHENGMING", "FOURUNCLES00142", "LAISIYI", and "LAISIYIWS."  These packages were sent to BIJANPOUR at SUBJECT PREMISES 2 prior to February of 2019, and were not intercepted by CBP officers at the IMF in Torrance, California.

    40.  Specifically, since March 29, 2018, BIJANPOUR has been sent or has received approximately 900 packages to SUBJECT

---

    [4] Not all of the packages intercepted by CBP relating to these senders contain firearms, firearms parts, suppressors or suppressor parts, as many of the packages contain the listed items on the commodity description.

PREMISES 1 and 2.  Of those 900 packages, 768 were from China,
and 25 packages were from HONGMEI SONG, "WANGLIANHUI"
"TAOZHENGMING", "FOURUNCLES00142", "LAISIYI", and "LAISIYIWS."[5]

G.    Investigation of SUBJECT PREMISES 1

41.   From my review of open-source records and law
enforcement database, I know the following regarding SUBJECT
PREMISES 1:

a.    SUBJECT PREMISES 1 was recently purchased by
BIJANPOUR in February of 2019.

b.    Since February of 2019, a majority of incoming
international packages addressed to BIJANPOUR are destined for
SUBJECT PREMISES 1.

c.    BIJANPOUR's most recent listed address is SUBJECT
PREMISES 1.

42.   Address checks and surveillance of SUBJECT PREMISES 1
revealed the following information:

a.    On August 30, 2019, HSI SA Aaron Deguzman and I
conducted an address check of SUBJECT PREMISES 1 and saw a USPS
Letter Courier delivering packages at SUBJECT PREMISES 1.  We
spoke with the Letter Courier and the Letter Courier revealed
that he had dropped off multiple packages at SUBJECT PREMISES 1.
The Letter Courier showed us a package that was clearly labelled
to BIJANPOUR with SUBJECT PREMISES 1 as the intended
destination.

---

[5] 128 packages were received from non-Chinese origins
including from Hong Kong, Singapore, the Netherlands, and
Australia, and were not targeted for inspection.   Four packages
were received from China from 2011-2014. These packages were not
intercepted or examined.

14

b.   On September 5, 2019, HSI SA Aaron Deguzman and I conducted surveillance of SUBJECT PREMISES 1.   We saw SUBJECT VEHICLE 1 parked in the driveway of SUBJECT PREMISES 1.   Law enforcement databases show that SUBJECT VEHICLE 1 is registered to BIJANPOUR.  We further observed BIJANPOUR exit SUBJECT PREMISES 1, enter SUBJECT VEHICLE 1 and leave SUBJECT PREMISES 1.   BIJANPOUR was dressed in a tan colored fedora hat and a tan colored shirt.

H.    Investigation of SUBJECT PREMISES 2

43.   From my review of open-source records and law enforcement databases, I know the following regarding SUBJECT PREMISES 2:

a.   According to law enforcement databases and the ATF, BIJANPOUR has used SUBJECT PREMISES 2 as his residence when purchasing and registering his firearms.

b.   BIJANPOUR's lease for SUBJECT PREMISES 2 will end at the end of January 2020.

c.   A majority of the incoming international packages before February 2019 addressed to BIJANPOUR were addressed to SUBJECT PREMISES 2, with the most recent package addressed to SUBJECT PREMISES 2 being a parcel from "WANGLIANHUI" on December 2, 2018.  However, as described in greater detail below, based on my training and experience, I believe that evidence of the Subject Offenses will be found at SUBJECT PREMISES 2 as it is one of the residences that BIJANPOUR controls.

44.   Address checks and surveillance of SUBJECT PREMISES 2 revealed the following information:

15

a.   On August 30, 2019, HSI SA Aaron Deguzman and I spoke with Thomas Vriens, Compliance Manager for GHP Management. GHP Management manages the Da Vinci Apartment complex, in which SUBJECT PREMISES 2 is located.  Thomas Vriens told us that BIJANPOUR has been a resident of SUBJECT PREMISES 2 since the year 2017, is currently a resident; recently renewed his lease his for SUBJECT PREMISES 2, which will expire at the end of January 2020; and that his assigned parking spots for SUBJECT PREMISES 2 are 471 and 472.

b.   On September 5, 2019, HSI SA Aaron Deguzman and I spoke with security personnel at SUBJECT PREMISES 2.  The security personnel took us to parking spots 471 and 472.  While walking towards parking spots 471 and 472, we saw SUBJECT VEHICLE 2 leaving the parking garage.  When we arrived at parking spot 471 and 472, we saw SUBJECT VEHICLE 1, previously parked at SUBJECT PREMISES 1, now parked across both parking spots 471 and 472.

c.   A review of security footage by HSI SA Aaron Deguzman and I at the Da Vinci complex that contains SUBJECT PREMISES 2 showed BIJANPOUR parking SUBJECT VEHICLE 1 at parking spot 471 and 472.  The security footage further showed BIJANPOUR taking items out of his SUBJECT VEHICLE 1, transferring the items to SUBJECT VEHICLE 2 and entering the SUBJECT VEHICLE 2. BIJANPOUR was dressed in a tan colored fedora hat and a tan colored shirt, the same attire from surveillance conducted at SUBJECT PREMISES 1 earlier in the day.  We conducted a further review of security footage using different cameras, which showed

16

the license plate of SUBJECT VEHICLE 2.  Law enforcement
databases show this vehicle as being registered to BIJANPOUR.[6]

    d.  We reviewed past security footage of different
dates and times which showed BIJANPOUR parking SUBJECT VEHICLE 1
at parking spots 471 and 472.  The security footage further
showed BIJANPOUR exiting SUBJECT VEHICLE 1, walking into the
elevator, getting off on the 7th floor, and walking towards
SUBJECT PREMISES 2.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

    45.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

    a.  Those who illegally possess firearms, including
suppressors and Glock switches, often sell their illegal
firearms and purchase illegal firearms.  Particularly where, as
here, BIJANPOUR has received hundreds of parcels that likely
contain firearms suppressors and Glock switches, BIJANPOUR
likely also stores and sells those prohibited items to others
and evidence of that possession and sale would be on his person
and in the residences and vehicles that he controls.

    b.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as

---

[6] On May 25, 2019, BIJANPOUR changed the license plate on
his vehicle to 8JJZ433, which is registered in his name, but to
a P.O. Box in Atlanta, Georgia. The previous license plate,
8GCE395 was registered to BIJANPOUR at SUBJECT PREMISES 2. Both
license plates correspond to the same Vehicle Identification
Number, 58ABK1GG2JU115872.

items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices and in residences and vehicles that they control.  It has been my experience that those who own and deal firearms illegally will keep the contact information of the individual who is supplying firearms for future purchases or referrals.  Such information is also kept on digital devices at residences and vehicles they control.

c.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices, or of firearms that they wish to sell to others.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.  Digital devices containing such evidence are kept on the person and in residences and vehicles.

d.   Correspondence between persons buying and selling firearms, including correspondence between co-conspirators in the dealing of firearms without a license or the illegal importation of firearms such as suppressors and Glock switches, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in illegal sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell

or offer for sale.  In addition, it is common for individuals
engaging in the unlawful sale of firearms to have photographs of
firearms they or other individuals working with them possess on
their cellular phones and other digital devices as they
frequently send these photos to each other to boast of their
firearms possession and/or to facilitate sales or transfers of
firearms.

> e.   Individuals engaged in the illegal purchase or
sale of firearms often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

46.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

> a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the

---

7 As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

Case 2:19-mj-03913-DUTY *SEALED*   Document 1 *SEALED*   Filed 09/17/19   Page 31 of 35
Page ID #:31

Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

47.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BIJANPOUR's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BIJANPOUR's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22

49.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  NON-ATTACHMENT OF AFFIDAVIT

50.   The affidavit has not been attached to the search warrant because allowing disclosure to BIJANPOUR during the search would give BIJANPOUR and other subjects of the investigation an opportunity to destroy evidence, change patterns of behavior, notify confederates, flee from prosecution, or otherwise seriously jeopardize the investigation.   In addition, I am aware that "if the face sheet and attachments clearly state that the agents have lawful authority to conduct the search and specify the location to be searched and the items sought, the affidavit supporting the probable cause determination need not be served at the time of the search."  United States v. Celestine, 324 F.3d 1095, 1100, 1101 (9th Cir. 2003).

///

///

## VIII. <u>CONCLUSION</u>

51.  For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of SUBJECT PREMISES 1 and 2 and SUBJECT VEHICLES 1 and 2, described in Attachments A–1 through A–4.

_____
Douglas W. Choi,  Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this ___ day of September, 2019.

_____
UNITED STATES MAGISTRATE JUDGE